CHARLESTON SHIPYARDS, INC.,
Libellant,

v.

THE Motor Vessel POLING BROTHERS V, her engines, boilers, machinery, tackle and furniture, Respondent,
and against
all persons intervening for their interests therein, Respondents.

BOSUL SHIPPING CORPORATION,
Cross-Libellant,

v.

CHARLESTON SHIPYARDS, INC.,
Cross-Respondent.
No. 1092.

United States District Court
E. D. South Carolina,
Charleston Division.
Oct. 10, 1960.

Waring & Brockinton, Charleston, S. C., for libellant and cross-respondent.

Moore & Mouzon, Charleston, S. C., for respondent and cross-libelant.

WYCHE, District Judge.

This action came on for trial before me, sitting by designation in admiralty, on July 19, 1960. It was brought to recover sums allegedly due for services rendered and materials furnished by Charleston Shipyards, Inc., to the Motor Vessel Poling Brothers V while in the Port of Charleston.

Early in May, 1958, the Motor Vessel Poling Brothers V came into the Port of Charleston in a leaking condition. A few days after arrival, while attempting to proceed from the Cooper River up the Wando River, she began to take in a great deal of water and was beached by her master on the eastern shore of the

Cooper River. The vessel obtained the services of Salmons Dredging Company to pump it out and remove it from where it was beached. When the vessel was floated, she was brought to the dock of Charleston Shipyards, Inc., on the western shore of the Cooper River. At the request of the master of the vessel and the representatives of the owner, the shipyard furnished gasoline pumps for use in refloating the vessel, together with labor, tugs and other services relating to the refloating and to the mooring of the vessel at its dock. Thereafter, again at the request of the master, the vessel was placed on the drydock of the shipyard where a survey was conducted by a surveyor employed by the owner and by others representing the owner. As a result of this survey it was determined that certain work would have to be performed on the ship's bottom and on the engines, motors, electrical equipment and other parts of the vessel. The shipyard was requested to do this work and the items of work to be performed were specifically designated by the master and representatives of the owner of the vessel.

While the ship was on its drydock, the shipyard performed such repair services on the bottom as it was requested to do and then placed the vessel alongside its dock to proceed with other designated repairs. After some of these repairs had been completed, the shipyard informed the owner that it would not continue with the repair work unless some assurance was given in respect to the payment for the services that had been and were to be performed. The owner gave no satisfactory assurance in this respect, but stated that it would send a representative to Charleston to discuss the situation. The shipyard then informed the owner that until further arrangements were made it would do no more work on the vessel and would furnish no services therefor. After this notification by the shipyard and before the representative of the owner came to Charleston, the vessel remained at the shipyard's dock, with its master and crew aboard in full charge and control of the vessel. During the existence of this situation, the vessel filled with water and sank to the bottom alongside the dock.

Upon arriving in Charleston, the representative of the owner discussed the situation with officers of the shipyard but would give no assurance that payment would be made for the work performed or for any additional work on the vessel, including the raising and refloating of the same. The vessel in its sunken condition was blocking the dock and preventing the use thereof by other prospective customers of the shipyard. The master and crew abandoned the vessel and the owner did nothing whatsoever to remedy the situation.

It was testified by James J. Sheeran that before the sinking, the gasoline pumps were removed by the shipyard from the vessel, although prior thereto, during a long distance telephone conversation he had had with L. Louis Green, III, an understanding was reached that the situation in relation to the vessel would not be changed until Sheeran's arrival in Charleston. Green agreed that he had had a long distance telephone conversation with Sheeran at the time referred to, during which he had told Sheeran that the shipyard would do no work on the vessel and furnish no services to it until Sheeran arrived in Charleston, but that the vessel would be allowed to remain temporarily at the dock where it then lay. After this conversation, the shipyard removed the gasoline pumps, which required constant attention of one or more men, and substituted automatic pumps which required only an occasional check by the crew of the vessel. Green said that this change was consistent with his advice to Sheeran that the shipyard would furnish no labor or services to the vessel until satisfactory arrangements were made by the owner to assure payment for the services.

■ In my opinion, the shipyard was under no obligation to perform any service for the vessel after it notified the owner that it would not do so until payment was assured. Certainly, the ship-

yard was entitled to be assured of payment for any services that it undertook to perform and there was no reason for the owner to expect it to continue its efforts to repair the vessel or furnish other service to it without any assurance of payment. If the shipyard allowed the vessel to use any of the shipyard's pumps after this notification, it did so gratuitously and without obligation. There was no obligation on the shipyard to continue to supply and man gasoline pumps and the responsibility to protect the vessel from sinking rested upon the master and crew in the use of whatever facilities were available. Furthermore, there has been no showing that the automatic pumps which were upon the vessel when it sunk were not functioning properly or were inadequate for their intended use, or that the gasoline pumps would have prevented the sinking.

The libel sets forth four separate bases for recovering the total sum of $22,150, and Bosul Shipping Corporation, as owner of the vessel, has interposed a cross-libel asking for damages in the sum of $50,000. I will separately discuss the libellant's bases for recovery and the cross-libel of Bosul Shipping Corporation.

■ The first item of claim of the shipyard is that, at the instance and request of the master of the vessel and of the agent and representative of the owners, certain repairs to the hull, machinery and superstructure of the vessel and certain services, material, supplies, labor, dry dockage and other necessaries were furnished of the reasonable value of $5,160. The Answer of the respondent admits that certain repairs and services were furnished to the vessel but denies that the value of the same was $5,160. At the trial, the shipyard placed in evidence an itemized statement showing the various services performed and the charges therefor, which statement contained a certificate signed by the master of the vessel that the work had been authorized to be performed by the shipyard, and that the same had been completed satisfactorily. Louis L. Green,

III, Vice President of Charleston Shipyards, Inc., testified that the charges shown in the statement were reasonable and proper and that no part of the same had been paid. No contradictory evidence on the subject was offered by the respondent. Upon the evidence before me, I am of the opinion that the libellant is entitled to recover this sum of $5,160.

■ The second item of claim advanced by the shipyard is for raising, floating, cleaning and otherwise caring for the vessel after it sank at the dock of the shipyard. It is asserted by the shipyard that the reasonable charge for this service was $15,000, which amount of charge the shipyard attempted to support by showing that Salmons Dredging Company had offered to perform this service for the sum of $15,000, but no agreement in respect thereto was ever reached. Although it has not been established that authorization was given on behalf of the vessel to raise it, clean it, or move it after it sank at the shipyard's dock, I am of the opinion that the shipyard was justified in moving the sunken vessel from its dock so that it might have use of the dock. However, in this connection, the shipyard is entitled to recover only the expense to which it was put for clearing its dock of the sunken vessel and it is not entitled to a profit, such as it might reasonably have expected in the event of a contract of service. The shipyard has shown that its expense in connection with raising the vessel and removing it from the dock where it had sunk was $5,286.98. It is my opinion that the libellant is entitled to recover $5,286.98, representing its actual expense for raising the vessel and removing it from its dock.

■ The third item claimed by the libellant is in the sum of $850, being the cost of removing a United States Naval vessel from the slip in which the sunken Poling Brothers V lay, in order to assure the safety of the Navy vessel and avoid the likelihood of damage to her. A paper dated May 28, 1958, submitted in evidence as an exhibit of the shipyard, shows that the master of the Poling

Brothers V authorized the shipyard to furnish necessary labor, material, tug boats and equipment to move a "D.E." from north of Pier D to north of Pier A, so as to permit the salvage operations in connection with the Poling Brothers V. Green testified that the reasonable value of this service was $850 and there is no contradictory testimony on the subject. I am therefore of the opinion that the libellant is entitled to recover from the respondent the sum of $850 for the expense to which it was put in removing the United States Navy vessel from its slip in order to conduct salvage operations on the Poling Brothers V.

The fourth item claimed by the libellant is for dockage of the vessel for a period of 76 days, that is to say for dockage from May 23rd to August 7th, when this action was instituted. Dockage is charged at the rate of $15 per day and the testimony shows that this is a reasonable charge for such service. I am of the opinion that this charge should be allowed and that the libellant is entitled to recover from the respondent the sum of $1,140 for dockage up to the date of the institution of this action.

The cross-libel of Bosul Shipping Corporation alleges that Charleston Shipyards, Inc., was employed to do necessary repairs to the hull, machinery and equipment of the vessel but by reason of the inefficiency, carelessness and negligence of the shipyard, the vessel was caused and permitted to sink, so that it sustained serious damage and was unable to pursue its voyage. The testimony shows that certain specified repairs to the vessel were performed by the shipyard and that these were certified by the master to have been completed satisfactorily. There were, indeed, other repairs that should have been made to the vessel which the shipyard refused to perform without some assurance of payment and so notified the owners. The vessel sank at a time when it was manned and in charge of its master and crew and after the owner had been notified that no services to the vessel were being or were to be performed by the shipyard until other arrangements therefor had been consummated. It has not been shown that Charleston Shipyards, Inc., neglected to perform, properly and satisfactorily, any obligation which it had undertaken that might in any way have caused or contributed to the sinking. I am of the opinion that the cross-libel of Bosul Shipping Corporation is without foundation and should be dismissed.

Upon consideration of the entire record in the cause and based upon the credible evidence presented, I find and conclude as follows:

### Findings of Fact

1. Charleston Shipyards, Inc., the libellant herein, is a corporation created by and existing under the laws of the State of South Carolina, with its principal place of business in the City of Charleston, County of Charleston, State of South Carolina, within this district.

2. The Motor Vessel Poling Brothers V is a cargo vessel of American registry, now and at the commencement of this action in the Port of Charleston, owned by Bosul Shipping Corporation, a corporation created by and existing under the laws of one of the states of the United States other than the State of South Carolina, with its principal place of business in the City of New York, State of New York.

3. This Court has jurisdiction of the parties to the cause and the cause is within the admiralty and maritime jurisdiction of this Court.

4. In the latter part of May, 1958, at the instance and request of the master and agents of M/S Poling Brothers V, the libellant furnished certain gasoline pumps, tug service, labor and materials to aid in raising the said vessel from a position on the eastern shore of the Cooper River and in mooring it alongside the libellant's dock; and thereafter drydocked the said vessel and made certain designated repairs to the bottom, engines, machinery, electrical equipment and other portions of the vessel. All of

the said services were satisfactorily performed and the reasonable value of the said services, together with the materials and supplies used in connection therewith, was $5,160, no part of which has been paid.

5. On May 25, 1958, while M/S Poling Brothers V was moored at the dock of the libellant, in charge of her master and crew, and without any fault on the part of the libellant, the said vessel sank and remained in a sunken condition until she was raised by the libellant on or about August 1, 1958, at a cost to the libellant of $5,286.98. The expenditure of the sum of $5,286.98 by the libellant was necessary in order that the libellant might relieve its dock from being blocked by the sunken vessel and so that the same might be used. The libellant is entitled to the repayment by the respondent of the sum of $5,286.98 expended as aforesaid and no part of such sum has been paid to the libellant.

6. On May 28, 1958, in order to assure the safety of a United States Navy vessel, then moored at the libellant's dock near the sunken M/S Poling Brothers V, the libellant, at the instance and request of the master of M/S Poling Brothers V, moved the said United States Navy vessel to another mooring and the reasonable value of such service is $850, no part of which has been paid to the libellant.

7. From May 23 to August 7, 1958, the said M/S Poling Brothers V was docked at the docks of the libellant and a reasonable dockage charge therefor is $15 per day, making a total sum of $1,140 due and owing to the libellant by the said vessel, no part of which has been paid.

8. The sinking of the M/S Poling Brothers V at the dock of Charleston Shipyards, Inc., on May 25, 1958, and any loss or damage suffered by its owner, Bosul Shipping Corporation, as the result of such sinking, was not due to or caused by any inefficiency, carelessness or negligence of Charleston Shipyards, Inc., or by the failure of Charleston Shipyards, Inc., to perform any undertaking or obligation.

Conclusions of Law

1. The libellant, Charleston Shipyards, Inc., is entitled to recover from the respondent, the M/S Poling Brothers V, the total sum of $12,436.98, together with lawful interest thereon.

2. The vessel, the M/S Poling Brothers V, now in the custody of the Marshal of this Court, should be condemned and sold by the Marshal to pay the amount due the libellant, with interest and costs.

3. The cross-libellant, Bosul Shipping Corporation, is not entitled to the recovery of any sum from the cross-respondent, Charleston Shipyards, Inc., and the cross-libel should be dismissed.

Decree

Consistent with the Opinion, the Findings of Fact and Conclusions of Law hereinabove set forth, it is therefore

Ordered, adjudged and decreed that the libellant, Charleston Shipyards, Inc., recover of and from the respondent the sum of $12,436.98, together with interest to the date of this Decree, as follows: on $5,160 from May 28, 1958, amounting to the sum of $731, on $5,286.98 from August 1, 1958, amounting to the sum of $687.30, on $850 from May 28, 1958, amounting to the sum of $130.43, and on $1,140 from August 7, 1958, amounting to the sum of $148.20, making in all, both principal and interest, the total sum of $14,133.91, with interest thereon until paid; and also the costs to be taxed; and it is further

Ordered that the said vessel, the M/S Poling Brothers V, be condemned therefor and that the Clerk of this Court issue a writ of *venditioni exponas* to the Marshal of the district for the sale of the said vessel, her engines, boilers, machinery, tackle and furniture, on board thereof, the Marshal having given six days notice of sale pursuant to law; and it is further

Ordered that out of the proceeds of the sale of the said vessel, when paid into the registry of the Court, together with the sum of $635 now in the registry of the Court derived from the sale of cer-

tain bunker oil removed from the said vessel, the Clerk of this Court, after deducting the taxed cost of the officers of Court, distribute the balance in satisfaction of this Decree.